UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SURETTA MILTENBERGER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     vs. | ) Cause No. 1:17-cv-862-WTL-TAB |
| | ) |
| OSSIP OPTOMETRY, P.C., | ) |
| | ) |
|     Defendant. | ) |

**ENTRY ON MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Defendant's motion for summary judgment. (Dkt. No. 30.) The motion is fully briefed and the Court, being duly advised, **GRANTS** the Defendant's motion for the reasons set forth below.

## I.    STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in

search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. FACTUAL BACKGROUND

The Plaintiff alleges in this case that she was denied a transfer from the Shadeland Ossip Optometry location to the Carmel location because of her race and/or sex in violation of Title VII. The facts of record viewed in the light most favorable to the Plaintiff, the non-moving party, are as follow.

### A. Suretta Miltenberger

The Plaintiff, an African-American woman, joined the Defendant in September 2010 after a fourteen year career in optometry at LensCrafters. The Defendant has thirty-six locations, each with its own General Manager. The Plaintiff was initially placed as a team leader (now known as a General Manager) at the Defendant's Avon store, eventually moving to Eagle Creek and then Shadeland in 2013.

The year after the Plaintiff arrived at Shadeland, the store was given the Defendant's Store of the Year Award, which was based on certain metrics within the store. The Plaintiff was also awarded the Defendant's Open Eyes award three times: twice at Shadeland and once at Eagle Creek.

Under the job description for the General Manager position, the "Doctor Relationship" is listed as the first responsibility for a General Manager. A General Manager is required to "[b]uild a strong relationship with your doctor(s) to promote growth within the location and staff development" and "[f]oster an environment of open communication with the doctor - giving and receiving feedback, sharing ideas to promote a positive culture." Dkt. No. 30-10. The Plaintiff was close with the doctors at her location, and received compliments from the corporate office for her relationship with the doctors in her store.

2

On her most recent annual review prior to her application for the Carmel General Manager position, Dkt. No. 36-11, the Plaintiff's manager, Jennifer Brett, gave the Plaintiff an overall rating of 3.2, with "3" being "Meets Expectations," and a 1.8 on the Key Performance Indicators, with "2" meaning "Requires Improvement" and "1" meaning "Does Not Meet Expectations."

### B. The Shadeland and Carmel Locations

Shadeland is a unique store within the Defendant's system because of the store's demographics. Shadeland's sales mix is disproportionately made up of medical services, as opposed to retail sales, meaning that the store lost revenue whenever the number of days doctors were in the store decreased. Shadeland's annual sales volume was approximately $1.3 million per year, and Shadeland's customer base was generally less wealthy than that of the Carmel location. Indeed, the sales volume at the Carmel location was approximately $3 million. The Carmel location was "a top five revenue and profit location" for the Defendant and an "incredibly important practice for the overall business." Dkt. No. 36-13 at 28. The Plaintiff also notes that "[a] glance at the United States census shows that as of the 2010 census, the African-American population of Carmel was 3.5 percent." Dkt. No. 37 at 7.

Based on sales volumes, the Defendant characterized Shadeland as a B store and Carmel as an A store. Audrey Nelson, the District Manager for the Carmel location, told the Plaintiff she would likely receive a raise if she were to get the position at Carmel.

### C. Carmel Location General Manager Hiring Process

In early 2015, the position of General Manager at the Carmel location became available. While the Carmel General Manager position was open, Nelson and Brett sought to have the

Plaintiff serve as interim General Manager in Carmel,[1] and the Plaintiff served in that capacity at the Carmel store for the majority of the time during the vacancy.

At the time of the Plaintiff's application for the Carmel General Manager position, the Defendant's General Managers reported to its District Managers. The District Managers reported to Terry Atwood, who at the relevant time was the Defendant's Chief Operating Officer. Atwood was responsible for business operations and Dr. Scott Allison was in charge of the medical side. Terri Peschke, the Director of Operations, had a dual reporting relationship to Allison and Atwood. Peschke was responsible for the product line, logistics, information technology, and the building facilities.

The Carmel General Manager position was initially posted internally and three candidates, including the Plaintiff, applied for the position. Brett, the Plaintiff's District Manager at the time, enthusiastically signed off on the Plaintiff's application. The Plaintiff interviewed with Nelson, who advanced her and another internal candidate to the next round of interviews. The other internal candidate subsequently withdrew for personal reasons, leaving the Plaintiff as the only candidate for the position. Nelson recommended to Atwood that the Plaintiff be hired because the Plaintiff "met the needs of Carmel because she was able to perform

---

[1] The evidence cited for this factual allegation is the Brett Declaration, Dkt. No. 36-12. The Defendant argues that the Court should strike the Brett declaration because

> [The Plaintiff] submitted Brett's declaration *after* the close of discovery in which signed witness statements were requested; *after* [the Plaintiff] testified in her interrogatory answers that Brett's knowledge was limited to "[the Defendant's] pay practices and hiring process for the Carmel location,"; and *after* [the Plaintiff] testified at her deposition that her only communications with Brett involved informing Brett that she might be called as a witness . . . .

Dkt. No. 41 at 2 (internal citations omitted) (emphasis in original). Because consideration of the Brett Declaration does not change the outcome of the instant motion, the Court has considered it over the Defendant's objection.

the role of optician; she was able to perform the role of, I believe, technician and [patient service representative]." Dkt. No. 36-2 at 19. The Plaintiff was also endorsed by Brett and the Shadeland store's doctors.

The Plaintiff next interviewed with Jannell Gurney, the Defendant's director of human resources, and Atwood. Brett was surprised that the Plaintiff had to go to another round of interviews given that she was an internal candidate who was the unanimous choice of her current district manager, the store's district manager, and doctors. This process marked a change in procedure, as Atwood was not involved in the interview or hiring process for the prior Carmel General Manager. Following the interview with Gurney and Atwood, Atwood asked the Plaintiff to go to another interview with Peschke and Allison, another procedure unique to the Plaintiff's application process. In fact, Josh Wilcox, who received the Carmel General Manager position, never interviewed with either Peschke or Allison prior to being offered the position.

### D. Denial of General Manager Position

Atwood made the determination not to hire the Plaintiff for the Carmel position. The Plaintiff was informed that she was not selected for the Carmel General Manager position in a meeting with Gurney on October 1, 2015. During this meeting, Gurney did not offer any specific examples of problems with the Plaintiff's performance. The Plaintiff testified that prior to being denied the Carmel General Manager position, she had not been confronted or spoken to by any official of the Defendant regarding the alleged deficiencies in her performance that the Defendant says led to the denial of the Carmel position.

Atwood had met the Plaintiff three times prior to her interview for the Carmel General Manager position. Atwood claimed that he questioned the Plaintiff's loyalty to the Defendant and had trust concerns with her because she was rumored to be looking for outside positions. Nevertheless, the Plaintiff had been with the Defendant for more than four years when she

applied for the Carmel General Manager position, as opposed to Wilcox, who had been there for only a year. Atwood also testified that he believed the Plaintiff was unprofessional because of a complaint made by the Shadeland store landlord, but it is unclear when this occurred.

Gurney testified that the Plaintiff was part of a "clique" to the extent that it affected her professionalism. For example, Gurney testified that the Plaintiff had given her the cold shoulder for two months after the decision to terminate the prior Carmel General Manager, with whom she believed the Plaintiff was friends. Gurney also testified that "it wasn't easy to give feedback to [the Plaintiff]," Dkt. No. 36-2 at 20, and that she was caught off guard by the fact that the Plaintiff had moved her personal possessions to the Carmel store while she was serving as interim General Manager.

Peschke testified that the Plaintiff failed to keep the store clean, would be back in the office when she visited the store, was very closed off, and would try to show up presenters at General Manager meetings. Peschke testified that she expressed all of these concerns to Brett, though Brett denies ever receiving any feedback from Peschke regarding the Plaintiff. Peschke believed the Carmel location was struggling with morale and patient neglect and "needed a general manager that was going to be able to walk in there and right the ship." Dkt. No. 36-14 at 10. Peschke did not believe "that [the Plaintiff] would have been the one to be able to do that." *Id.*

### E. Hiring of Josh Wilcox

Josh Wilcox is a white male. Prior to his interview with the Defendant for the Carmel General Manager position, Wilcox had been the general manager of a new, recently acquired location, known as the Witham location, in Lebanon, Indiana. At the time Wilcox was hired, following the acquisition, there was no general manager at the location and the existing doctors at the location managed the business themselves. Wilcox had one prior performance review in

his file prior to his application for the Carmel General Manager position, issued by Nelson on April 20, 2015. In the performance review, he received an overall rating of .94 due to the fact that he was so new that the Key Performance Indicators were not calculated for his store. On the manager portion of the review, he received a rating of 2.4 which is above Requires Improvement but below Meets Expectations. In his subsequent review for his performance at Witham, which was not available at the time of the hiring decision but covered the time period prior, Wilcox received a 2.5 on the Key Performance Indicators and a $3^2$ on the soft skills scored by the Defendant.

After Wilcox's interview with Atwood and Gurney, he was hired for the Carmel General Manager position. Wilcox was not required to sit for an interview with Allison and Peschke. Atwood testified that such an interview was not required because he did not have concerns about Wilcox following the initial interview.

### III. DISCUSSION

The Plaintiff asserts a Title VII claim based on the Defendant's refusal to hire her to fill the General Manager position in its Carmel store. The Plaintiff defines this action as a hybrid race/sex discrimination claim for a failure to promote.[3] Following the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, the Plaintiff's claim will survive summary judgment if a reasonable jury, considering the facts of record in the light most favorable to the Plaintiff, could

---

[2] The Defendant states that Wilcox received a 3.2, but the performance review seems to state that he received a 3.

[3] The Plaintiff acknowledges that the Seventh Circuit has not yet weighed in on whether these types of "intersectional discrimination" cases are permitted in the Seventh Circuit. Dkt. No. 37 at 19. The Court assumes for the purposes of this ruling that such a claim is viable.

Likewise, the Defendant challenges the Plaintiff's characterization of its refusal to transfer the Plaintiff to the Carmel location as a failure to promote and an adverse action. Dkt. No. 31 at 23. For purposes of this ruling, the Court will assume that the Plaintiff suffered an adverse action when she was not chosen for the Carmel position.

conclude that discrimination was the reason for the adverse action. *See* Dkt. No. 37 at 21 (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)).

In response to the Defendant's motion for summary judgment, the Plaintiff argues that the Defendant hired a white male with less experience, fewer qualifications, and poorer work performance for the position and the Defendant's reasons for not hiring the Plaintiff are pretextual. Even assuming this to be true, the Plaintiff's claim must fail because pretext alone, without "some reason to infer that [discrimination] *was* the reason," is insufficient to survive summary judgment. *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (post-*Ortiz*) (emphasis in original); *see also Teruggi v. CIT Grp./Capital Fin., Inc.*¸709 F.3d 654, 661 (7th Cir. 2013) (stating, pre-*Ortiz*, that "[e]ven if [the plaintiff's] evidence showed pretext, that alone would not be sufficient to survive summary judgment"); *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295-298-99 (7th Cir. 2010) (holding, pre-*Ortiz*, that even if the plaintiff had provided evidence of pretext, the plaintiff's claim would still fail without "some minimal showing that the 'real reason'" for the decision was discrimination).

The Plaintiff cites *Giacoletto v. Amax Zinc Co., Inc.*, 954 F.2d 424 (7th Cir. 1992), and *Sattar v. Motorola, Inc.*, 138 F.3d 1164 (7th Cir. 1998), in support of her argument that subjective personal preference is an insufficient basis to avoid summary judgment when a less-qualified person who is not a member of the protected class is selected for a position, but these cases are distinguishable. For example, in *Giacoletto*, the Seventh Circuit upheld a jury verdict in an age discrimination case and warned that "[t]his case illustrates the risk employers take when they make employment decisions based on subjective judgments about qualities such as 'interpersonal skills.'" 954 F.2d at 426. Yet subjective decision-making is inherent to the hiring process, and "[t]hus, absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely

8

subjective criteria will rarely, if ever, prove pretext under Title VII." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1176 (7th Cir. 2002) (internal quotation marks and alterations omitted). The Seventh Circuit acknowledged as much in *Sattar*, stating that "[i]t is true that an employer's use of subjective criteria may leave it more vulnerable to a finding of discrimination, when a plaintiff can point to some evidence indicating that the subjective evaluation is a mask for discrimination." 138 F.3d at 1170. However, the Seventh Circuit continued, noting that "[i]t is that extra piece of objective evidence that [the Plaintiff] has not provided" and granted Defendants' motion for summary judgment. *Id*. Because the Plaintiff in this case also lacks that extra piece of objective evidence, the result must be the same here.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's motion for summary judgment, Dkt. No. 30, is **GRANTED**. All other pending motions are **DENIED** as moot in light of this ruling.

SO ORDERED: 9/18/18

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification